# EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made and entered into on this _____ day of July, 2014 by and between UTC Laboratories, L.L.C. d/b/a Renaissance RX, a limited liability company organized and existing under the laws of the State of Louisiana, domiciled in the Parish of Jefferson, State of Louisiana, with its business office address at 1441 Canal Street, Suite 401, New Orleans, Louisiana 70112, herein represented by its duly authorized representative, and hereinafter referred to as the "Company" and Jay Agee, a person of the full age of majority, domiciled in the County of ___________, State of ___________________, hereinafter referred to as "Employee."

**WHEREAS,** the Company operates a Toxicology and DNA testing laboratory and related healthcare business(es); and

**WHEREAS**, Employee has the expertise to assist the Company in its business; and

**WHEREAS**, The Company desires to employ the Employee, and the Employee desires to be employed by the Company as an Area Vice President; and

**WHEREAS,** it is the desire of the parties to record the provisions, terms and conditions of such employment by entering into a written agreement in regard thereto;

**NOW, THEREFORE,** the parties hereto, for and in consideration of the mutual and reciprocal covenants and agreements hereinafter contained, do hereby contract and agree as follows, to-wit:

## ARTICLE I.

## PURPOSE, EMPLOYMENT AND TERM

1.01 The purpose of this Agreement is to define the relationship between the Company as employer and Employee as an employee of the Company. This Agreement shall be effective as of July 1, 2014 ("Effective Date"), and, subject to termination for "Cause" (as defined below) or "Good Reason" (as defined below) pursuant to Article VI, shall continue for a period of one (1) year thereafter (the "Initial Term"), and shall thereafter automatically renew for

successive additional terms of one (1) year each until this Agreement and the Employee's employment hereunder are terminated pursuant to the provisions of Article VI or Article VI. The period of time from the Effective Date through the termination of this Agreement and Employee's employment hereunder pursuant to its terms is herein referred to as the "Term."

## ARTICLE II.

## PERFORMANCE AND DUTIES

2.01 As of the Effective Date, Employee shall render all of his or her professional services exclusively on behalf of the Company and agrees to work full-time solely as an employee of the Company. Employee shall devote all of his or her professional time, attention and skill to the performance of his or her duties as an Area Vice President for the Company. Employee shall have such duties and responsibilities as are assigned by the Company from time to time. Employee's ownership of the entity referenced herein shall not be deemed a violation of Section 2.01 of this Agreement until such time as any and all commissions have been paid out by said entity that are received for tests placed on or before June 30, 2014.

2.02 Employee shall observe and comply with those rules, regulations and policies of the Company as determined and promulgated in writing, from time to time. Employee and the Company further agree to adhere to all ethical considerations and all federal, state and municipal laws and ordinances applicable to the Company's business.

2.03 No later than the end of the first quarter of each calendar year that this Agreement is in effect, the Chief Commercial Officer shall meet with Employee and evaluate Employee's job performance for the prior calendar year. Such evaluation shall relate to the duties and responsibilities of Employee under this Agreement, to Employee's progress toward established goals as reasonably established by the Chief Commercial Officer, and to the working relationship between Employee, the Chief Commercial Officer, and other Company employees. In the event

that Employee's performance is deemed unsatisfactory in any respect, the Chief Commercial Officer shall describe in writing, in reasonable detail, specific instances of unsatisfactory performance. The evaluation shall include recommendations as to areas for improvement in all instances where the Chief Commercial Officer deems performance to be unsatisfactory. A copy of the written evaluation shall be given to Employee. If Employee disagrees with such evaluation, Employee may respond in writing. All such writings shall be made a part of Employee's confidential personnel file.

Additionally, with respect to an assessment of Employee's performance in the initial months of his or her employment hereunder, it is the intention of the Chief Commercial Officer and the Employee to meet no later than three (3) months after the Effective Date to conduct an informal review of Employee's performance and provide appropriate feedback to each other.

## ARTICLE III.

## COMPENSATION

3.01 Compensation Worksheet. As compensation for Employee's services hereunder, Company shall pay Employee the base salary, commissions, allowances, and other amounts listed on the compensation worksheet attached hereto as Exhibit A.

3.02 Withholding. The Company shall withhold from compensation payable to the Employee all applicable federal, state and local withholding taxes.

3.03 Fair Market Value. Company and Employee have agreed and will ensure hereafter that the compensation and expense reimbursement paid to Employee hereunder will be consistent with fair market value.

3.04 Termination of Employment. Employee's employment with Company is terminable pursuant to Article VI hereof, subject to the Company's severance payment obligations, if applicable, as set forth in such Article.

3.05 Frequency of Payment. Employee's salary shall be payable at the time of the Company's regularly scheduled payroll, which is presently bi-weekly. Under no circumstances shall Employee be paid less frequently than monthly.

3.06 Equity Incentive Awards. During Employee's employment, he or she will be eligible to participate in any grants or awards of long term equity incentives which are offered to other Company executives and management employees. Employee's participation in any such programs will be commensurate with his or her position in the Company, and any such awards or grants shall be determined in accordance with the terms and conditions of the plans, agreements and notices under which such grants or awards were issued.

## ARTICLE IV.

## BENEFITS

4.01 In addition to the commissions, the Employee shall be entitled to receive fringe benefits that are generally available to the Company's employees at his or her level in accordance with the then existing terms and conditions of the Company's policies.

4.02 Employee shall receive two (2) weeks of paid time-off for vacation. Furthermore, Employee shall receive the same number of paid holidays as other Company employees.

4.03 Employee shall be entitled to any and all other benefits afforded other Company executives and management employees.

## ARTICLE V.

## SICKNESS, DISABILITY AND DEATH

5.01 Employee's absence from work due to sickness or accident, for no more than thirty (30) days per each twelve (12) month period during the term of this Agreement, (not resulting in Employee's becoming "totally disabled" as that term is hereinafter defined) shall not result in any adjustment to Employee's compensation or rights under this Agreement.

5.02 In the event Employee is determined to be "totally disabled" as that term is hereinafter defined, this Agreement shall automatically terminate and Employee shall be entitled to receive the compensation to which he or she is entitled under Article III, paragraph 3.01 of this Agreement through the date of such determination. Employee shall be deemed to be "totally disabled" as follows:

(a) The term "totally disabled" shall be defined to mean a disability which prevents Employee from performing all of his or her customary duties as an employee of the Company for a period exceeding three (3) calendar months. The aforementioned determination of whether Employee is "totally disabled" may be made by either the Chief Executive Officer of the Company by notifying Employee of such, or by Employee notifying the Company of such. Such notice shall be in writing and if to the Chief Executive Officer of the Company, sent certified mail to the Company's registered office, and if to Employee, sent certified mail to Employee' principal residence. In the event either party disagrees with the determination, within fourteen (14) days from the receipt of the aforementioned notice, the parties shall select a physician agreeable to both, which physician shall determine whether Employee is "totally disabled" as that term is defined hereunder. In the event the parties cannot agree upon a physician, each party shall select a physician and the two physicians shall each render an opinion as to whether Employee

is "totally disabled," as that term is defined hereunder. In the event the two physicians disagree, such physicians shall mutually select a third physician whose determination shall be binding and conclusive upon the parties hereto. The medical expenses resulting from this procedure shall be equally divided between the Company and Employee.

(b) In the event Employee is unable to perform all of his or her customary duties as an employee of the Company for a period of three (3) calendar months, Employee shall automatically be determined "totally disabled." The fact that Employee is able to temporarily resume his or her duties as an employee shall not interrupt the aforementioned three (3) calendar month period unless Employee is able to resume his or her duties for three (3) consecutive months.

5.03 In the event of Employee's death during the term of this Agreement, this Agreement shall automatically terminate and Employee's estate shall be entitled to receive the compensation to which he or she is entitled under Article III of this Agreement through the date of his or her death.

## ARTICLE VI.

## TERM AND TERMINATION OF THIS AGREEMENT

6.01 Employment under this Agreement shall commence on or before the Effective Date and shall terminate as provided herein.

6.02 Termination by Employee.

(a) Employee may terminate this Agreement with or without Good Reason (as hereinafter defined), at any time, upon furnishing the Company with ninety (90) days written notice. In the event Employee does not provide the aforementioned ninety (90) day written notice, he or she shall forfeit any and all compensation and/or other payments he or she is entitled to hereunder, which has not yet been earned by Employee. If

Employee does provide timely written notice, Company shall have the option to request Employee to leave immediately but shall be obligated to pay him or her any and all amounts he or she would be entitled to had he or she continued rendering services under the provisions, terms and conditions of this Agreement for the aforementioned ninety (90) day period. Employee shall be entitled to no further severance.

(b) Termination for Good Reason shall mean a termination by Employee within ninety (90) days after Employee's knowledge of the occurrence of a Good Reason Event. For purposes of this Agreement, "Good Reason Event" shall mean the occurrence, or failure to cure the occurrence, of any of the following events without Employee's express written consent, provided that such occurrence or failure is not cured within thirty (30) days of Employee's giving the Company written notice thereof:

(i) any imposition upon Employee of unreasonable rules, regulations, working conditions or material changes to Employee's working conditions or responsibilities from his or her initial working conditions and responsibilities other than due to circumstances outside of the control of the Company or Employee; except, in each case, in connection with the termination of Employee's employment for Cause, or Disability, or as a result of Employee's death, or temporarily as a result of Employee's illness or other absence;

(ii) a material reduction in Employee's compensation or benefits; or

(iii) a material breach by the Company of any material provision of this Agreement.

6.03 Termination by the Company. The Company may terminate this Agreement with or without cause, at any time, upon furnishing Employee with written notice.

(a) In the event the Company is terminating this Agreement "with cause," the

written notice must state the "cause" and set forth the effective date of termination.

(b) For purposes of this Agreement, Cause shall mean any of the following if not cured within thirty (30) days after Employee's receipt of written notice thereof:

(i) a material and persistent failure by Employee to perform his or her duties pursuant to Article II of this Agreement;

(ii) habitual abuse of recreational drugs or alcohol;

(iii) conviction of a felony;

(iv) acts of gross disloyalty to the Company or to any of its affiliates or subsidiaries, including but not limited to theft, embezzlement, unauthorized disclosure of confidential information of the Company, public criticism of Company or its personnel;

(v) habitual unauthorized absences from work during normal business hours;

(vi) documented instances of irrational or obstructive behavior during business hours that interfere with the performance of the assigned duties of the Company's employees or his or her co-workers;

(vii) death or physical or mental disability which prevents Employee from properly performing his or her duties and responsibilities for a continuous period of three (3) months or more; or

(viii) any material breach of Employee's duties and obligations hereunder.

6.04 In the event the Company terminates this Agreement "without cause" or Employee terminates this Agreement for "Good Reason" during the first year of his or her employment, beginning on the Effective Date, the Company shall be obligated to continue

paying Employee, as severance pay, based upon tests received by the lab for those accounts for the employees referenced on Exhibit B through June 30, 2015.

6.05 This Agreement may be terminated, at any time, upon the mutual consent of the parties. Any severance pay will be negotiated by the parties at that time.

## ARTICLE VII.

## CONFIDENTIALITY, RESTRICTIVE COVENANTS, AND INTELLECTUAL PROPERTY PROTECTION

7.01 Employee acknowledges that he or she has executed, and has agreed to abide by, the Confidential Information, Inventions and Works, and Materials Agreement attached hereto as Exhibit D, including any and all restrictive covenants contained therein. The Employee further acknowledges that he or she has executed, and has agreed to abide by, Schedules 1, 2, and 3 attached hereto, as well as any other related documents presented to him or her now or in the future pertaining to the Company's protection of its intellectual property.

## ARTICLE VIII.

## MISCELLANEOUS

8.01 Waiver of Restrictive Covenants in Underlying Agreements. Employee acknowledges the existence of downstream sales contracts or agreements entered into by an entity owned and/or managed by him/her, including, without limitation, any Independent Sales Distributor Agreement, Sales Services Agreement, or Consulting Services Agreement, and an individual who has, heretofore, held the position of "account manager," "territory manager," "implementation specialist," or the like, that contain certain restrictive covenants, including, without limitation, non-competition and non-solicitation provisions. Employee hereby specifically agrees to waive, and to obtain a written waiver from any entity owned and/or managed by him/her, in its entirety any restrictive covenant contained in any such contract or

agreement to the extent that they apply to those independent contractors with whom the Employee previously contracted who are making the transition to a direct employee of the Company. These employees are specifically identified on Exhibit B hereto. The waiver to be executed by the entity referenced herein is attached as Exhibit C hereto.

8.02 The Employee: (a) has carefully read and understands all of the provisions of this Agreement and has had the opportunity for this Agreement to be reviewed by counsel, (b) acknowledges that the duration, and subject matter of Sections 7.01 and 8.01, as more fully set forth in Exhibit D, of this Agreement are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests and Confidential Information of the Company and its affiliates, and (c) will be able to earn a satisfactory livelihood without violating this Agreement.

8.03 No Debarment/Exclusion. Employee represents that he or she has not been convicted of a crime related to healthcare and is not currently listed by a federal agency as debarred, excluded or otherwise ineligible for participation in federally funded programs (including, without limitation, federally funded healthcare programs, such as Medicare and Medicaid). Company may immediately terminate this Agreement upon notification of Employee's conviction of a criminal offence relating to the delivery or financing of healthcare services or if Employee is listed by a federal agency as debarred, excluded or otherwise ineligible for federal or state healthcare program participation. In the event that Employee is debarred or excluded as described above, the Company's obligation for payment to Employee will cease as of the date of such debarment or exclusion.

8.04 Compliance with Health Care Laws. The parties agree that, at the time this Agreement is executed, the subject matter hereof is legal and enforceable. It is expressly recognized and understood by the parties hereto that the prohibitions of the federal Anti-

kickback Statute and applicable state laws (the "Health Care Laws") will affect the parties hereto except to the extent the parties otherwise fall within a safe harbor or other exception to such Health Care Laws; therefore, the parties agree that the terms and conditions of this Agreement must at all times comply with those exceptions. Specifically, it is understood and agreed that the Employee, during the Employee's employment with the Company, whether or not under this Agreement, shall at all times serve as a *bona fide* employee of the Company, as that term is defined or interpreted in connection with the Health Care Laws. Accordingly, if either party, in good faith, determines at any time or is reliably informed by governmental authorities that the Agreement violates or is likely to be determined by a third party to violate such laws, rules, regulations, policies or interpretations, this Agreement will be deemed to be automatically modified to comply with such law or regulation. The parties further agree to meet immediately upon such determination and in good faith to amend this Agreement so as to eliminate such concern or violation and to bring this Agreement into compliance with the foregoing. If the Agreement cannot be brought into compliance with such law or regulation, it shall be terminated.

**The Federal Anti-Kickback Statute prohibits certain conduct involving improper payments in connection with the delivery of items or services covered by a number of federal health care programs. Among other things, the statute applies where an individual offers or makes payments to another person in order to induce referrals or other prohibited conduct. Illegal payments or solicitations of payments include those in cash or in kind, *i.e.*, goods, those made directly or indirectly, and those made overtly or covertly. In addition, the "Stark" physician self-referral law prohibits physicians from referring Medicare patients to a clinical laboratory with which they have certain prohibited financial relationships. Employee shall not make any type of payment, in cash or in kind, to any medical professional (including, but not limited to, physicians, physician's assistants,**

**doctor's office administrative staff, or nurses), be it an individual or a corporate entity, whose patients are or may be provided with goods or services by the Company, and shall otherwise comply with all other Company policies and procedures related to the provision of business courtesies and other interactions with medical professionals.**

8.05 Enforceability, Etc. This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

8.06 Notices. All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

If to the Employee, as listed on the signature page of this Agreement;

If to the Company:

Renaissance RX
Attn.: Brandy Sheely, General Counsel
1441 Canal Street, Suite 423
New Orleans, LA 70112
bsheely@renrx.com
Fax: (504) 407-0450;

or at such other address, email, or fax number as may have been furnished by such person in writing to the other party. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed, on the date received, if given by

registered or certified mail, return receipt requested or given by overnight delivery service, or three days after the date mailed, if otherwise given by first class mail, postage prepaid.

8.07 Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the state of Louisiana without regard to its choice of law provisions. The parties agree that the exclusive venue for the litigation of any disputes arising under or related to this Agreement shall be in the United States District Court for the Eastern District of Louisiana unless the federal court does not have jurisdiction over the dispute; in such an event, exclusive venue shall lie in state court in Jefferson Parish Louisiana.

8.08 Amendments and Waivers. This Agreement may be amended or modified only by a written instrument signed by the Company and the Employee. No waiver of this Agreement or any provision hereof shall be binding upon the party against whom enforcement of such waiver is sought unless it is made in writing and signed by or on behalf of such party. The waiver of a breach of any provision of this Agreement shall not be construed as a waiver or a continuing waiver of the same or any subsequent breach of any provision of this Agreement. No delay or omission in exercising any right under this Agreement shall operate as a waiver of that or any other right.

8.09 Binding Effect. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors and administrators, successors and assigns, except that the rights and obligations of the Employee hereunder are personal and may not be assigned without the Company's prior written consent. Any assignment of this Agreement by the Company shall not be considered a termination of the Employee's employment.

8.10 Entire Agreement. This Agreement constitutes the final and entire agreement of the parties with respect to the matters covered hereby and replaces and supersedes all other agreements and understandings relating hereto and to the Employee's employment.

8.11 Survival. The provisions of Sections 7.01, 8.01, and 8.02 of this Agreement shall survive the term of this Agreement and the termination of the Employee's employment with the Company, and shall continue thereafter in full force and effect in accordance with their terms.

8.12 Counterparts. This Agreement may be executed in any number of counterparts, including counterpart signature pages or counterpart facsimile signature pages, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.13 No Conflicting Agreements. Subject to the provisions of Section 8.01 and the agreements/contracts referenced therein, which agreements/contracts have been terminated as of July 1, 2014, Employee represents and warrants to the Company that Employee is not a party to or bound by any confidentiality, non-competition, non-solicitation, employment, consulting or other agreement or restriction that could conflict with, or be violated by, Employee's performance of his or her duties other obligations to the Company under this Agreement, or otherwise by Employee's employment with the Company.

8.14 Captions. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

8.15 No Strict Construction. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement, this Agreement shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

8.16 In the event of litigation in connection with this Agreement, the prevailing party shall be entitled to recover its/his/her legal fees and the costs associated with such litigation to the extent the aforementioned legal fees and costs are reasonable.

**Employee Name** | **Renaissance RX Agent**

______________________________ | ______________________________

**Signature** | **Signature**

______________________________ | ______________________________

**Address (For Notice Purposes)**

______________________________

______________________________

______________________________

**Phone Number (For Notice Purposes)**

______________________________

**Fax Number (For Notice Purposes)**

______________________________

**Email Address (For Notice Purposes)**

______________________________

## **Exhibit A**

### Compensation, Bonuses, and Allowances

- AVP will get paid 33% of collections less the fixed and variable costs in their area of responsibility as currently defined.
  - *This will be reconciled and paid quarterly*
    - *The 33% calculation can go either way against the AVP (I.e. 1% deduction from future commissions if COS is 34% less the 33% target in the event of an overage)*

  - *Note: Specimen collection cost is not included in the 33%*
- AVP's get 21% commission monthly less variable commission payments paid out on a monthly basis for cash flow
- Base Salary- $120,000
- Maximum monthly expenses of $10,000
- Monthly car allowance of $600

## Exhibit B

## Waiver of Restrictive Covenants as to the Following Employees:

| |
|---|
| Joe Laguardia |
| Kristin Clements |
| Laurie Gerlach |
| Paul Bruns |
| Paul Hurley |
| Peter Scardello |
| Shawn VanDyke |
| Brad Parker |
| Brett Parker |
| Carolyn Albin |
| Jeff Maxwell |
| Cyndee Caesar |
| Clayton Lamb |
| Dick Cook |
| Scott Nader |
| Joe Ostroski |
| Lacy Gutierrez |
| Alessandro Borroni |
| Chris Benton |
| Jeff Orr |
| Julia Huls |
| Kristen Swilley |
| Kristine Heidrich |
| Lacey Fonseca |
| Margie Ferguson |
| Marlin Blakeney |
| Jack Hill |
| Justin Peterson |
| Noah Cardona |
| Ron Meredith |
| Sean Masler |
| Sheryl  Czipott |
| Suzanne Munoz |
| Monique Deckter |
| Jay Agee |
| Brad Church |
| Carl Giorgi |
| Lee Sussman |
| Maya Tuyor |
| Torbin Scholer |
| Wendy Irvine |

## Exhibit C

## Waiver of Restrictive Covenants

This Wavier of Restrictive Covenants is executed this date by Infinity Medical Products, LLC, an Arizona limited liability company through Jay Agee, its duly authorized representative. Infinity Medical Products, LLC entered into one or more contracts with and/or impacting the following entities and/or persons:

| | |
|---|---|
| Joe Laguardia | BP Medical |
| Kristin Clements | BP Medical |
| Laurie Gerlach | BP Medical |
| Paul Bruns | BP Medical |
| Paul Hurley | BP Medical |
| Peter Scardello | BP Medical |
| Shawn VanDyke | BP Medical |
| Brad Parker | BP Medical |
| Brett Parker | BP Medical |
| Carolyn Albin | BP Medical |
| Jeff Maxwell | BP Medical |
| Cyndee Caesar | Cyndee Caesar |
| Clayton Lamb | Dickster LLC |
| Dick Cook | Dickster LLC |
| Scott Nader | Dickster LLC |
| Joe Ostroski | Joe Ostroski |
| Lacy Gutierrez | Lacy Gutierrez |
| Alessandro Borroni | Living at Next Level |
| Chris Benton | Living at Next Level |
| Jeff Orr | Living at the Next Level |
| Julia Huls | Living at the Next Level |
| Kristen Swilley | Living at the Next Level |
| Kristine Heidrich | Living at the Next Level |
| Lacey Fonseca | Living at the Next Level |
| Margie Ferguson | Margie Ferguson |
| Marlin Blakeney | Marlin Blakeney |
| Jack Hill | Maz Medical |
| Justin Peterson | Maz Medical |
| Noah Cardona | Maz Medical |
| Ron Meredith | Maz Medical |
| Sean Masler | Maz Medical |
| Sheryl Czipott | Maz Medical |
| Suzanne Munoz | Maz Medical |
| Monique Deckter | Monique Deckter |
| Jay Agee | OWNER |
| Brad Church | QRS Inc. |
| Carl Giorgi | QRS Inc. |
| Lee Sussman | QRS Inc. |
| Maya Tuyor | QRS Inc. |
| Torbin Scholer | QRS Inc. |
| Wendy Irvine | Wendy Irvine |

The contract contains certain restrictive covenants, such as non-competition and non-solicitation provisions, that might otherwise impede the above-referenced persons from performing as a sales representative for Renaissance RX. Infinity Medical Products, LLC hereby irrevocably waives in their entirety the restrictive covenants found in the contract as to these entities and/or employees.

Executed this _____________ day of ___________________________, 2014.

**Infinity Medical Products, LLC**

**__________________________________**

**By: ______________________________**

**Its: ______________________________**